UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. MJ20-658 |
| Plaintiff, | COMPLAINT FOR VIOLATIONS |
| v. | 18 U.S.C. § 844(f)(1)<br>18 U.S.C. § 844(i) |
| TYRE WAYNE MEANS, | 18 U.S.C. § 922(j)<br>18 U.S.C. § 922(g)(1), (8) |
| Defendant. | |

BEFORE, Brian A. Tsuchida, Chief United States Magistrate Judge, Seattle, Washington.

## COUNT 1

### *(Arson)*

On or about May 30, 2020, at Seattle, in the Western District of Washington, TYRE WAYNE MEANS did maliciously damage and destroy, and attempt to damage and destroy, by means of fire, a vehicle, that is, Vehicle 5, that was used by the Seattle Police Department in interstate and foreign commerce and in an activity affecting interstate and foreign commerce, and that was in whole or in part owned and possessed by the Seattle Police Department, an institution and organization receiving Federal financial assistance.

All in violation of Title 18, United States Code, Sections 844(f)(1) and 844(i).

COMPLAINT FOR VIOLATIONS - 1

## COUNT 2

### *(Possession of a Stolen Firearm)*

On or about May 30, 2020, at Seattle, within the Western District of Washington, TYRE WAYNE MEANS did knowingly possess a stolen firearm, that is, an FN Herstal FN15 5.56x45mm rifle with serial number FNCR012595, which had previously been shipped and transported in interstate and foreign commerce, knowing and having reasonable cause to believe that the firearm was stolen.

All in violation of Title 18, United States Code, Section 922(j).

## COUNT 3

### *(Unlawful Possession of a Firearm)*

On or about May 30, 2020, at Seattle, within the Western District of Washington, TYRE WAYNE MEANS, knowing he had been convicted of the following crimes punishable by a term of imprisonment exceeding one year:

> *Serious Injury by Vehicle* and *Willful Obstruction of Law Enforcement Officers by Use of Threats or Violence*, in the Baker County (Georgia) Superior Court, on or about May 22, 2015;

did knowingly possess, in and affecting interstate and foreign commerce, a firearm, that is, an FN Herstal FN15 5.56x45mm rifle with serial number FNCR012595, that had been shipped and transported in interstate and foreign commerce.

All in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT 4

### *(Unlawful Possession of a Firearm)*

On or about May 30, 2020, at Seattle, within the Western District of Washington, TYRE WAYNE MEANS, knowing he was subject to a court order meeting the requirements of Title 18, United States Code, Section 922(g)(8)(A)-(C), that is, the Domestic Violence No Contact Order issued on April 24, 2018, in the matter of *State of Washington v. Tyre Wayne Means Jr.*, in Kitsap County Superior Court case number 17-1-01804-18, did knowingly possess, in and affecting interstate and foreign commerce, a

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  firearm, that is, an FN Herstal FN15 5.56x45mm rifle with serial number FNCR012595,
2  that had been shipped and transported in interstate and foreign commerce.

3      All in violation of Title 18, United States Code, Section 922(g)(8).

4      This complaint is to be presented by reliable electronic means pursuant to Federal
5  Rules of Criminal Procedure 4.1 and 41(d)(3).

6      The undersigned complainant, Gregory Heller, being duly sworn, further deposes
7  and states as follows:

8  **INTRODUCTION**

9      I, Special Agent Gregory Heller, am a duly sworn member of the Bureau of
10  Alcohol, Tobacco, Firearms, and Explosives (ATF).  I am currently assigned the ATF
11  Field Office located within the Seattle, Washington Field Division.  I have been
12  employed as a special agent since September 2014.  From 2007 to 2014 I was employed
13  as a police officer and detective in Gwinnett County, Georgia.  In total, I have
14  approximately thirteen years of state and federal law enforcement experience.

15      I am a graduate of Duke University in Durham, North Carolina, where I received a
16  Bachelor's of Science in Engineering (B.S.E.) in Civil Engineering.  I completed a twelve
17  week Criminal Investigator Training Program (CITP) and a fourteen week Special Agent
18  Basic Training (SABT) at the ATF National Academy/ Federal Law Enforcement
19  Training Center (FLETC) in Glynco, Georgia.  I also completed a 23-week Gwinnett
20  County Police Training Academy and was a Peace Officer Standards and Training
21  (P.O.S.T.) certified peace officer in the State of Georgia.

22      I am responsible for investigations involving certain unlawful activities, to include
23  violent crimes involving firearms and arsons that occur in the Western District of
24  Washington.  I am also responsible for enforcing federal firearms and explosives laws
25  and related statutes in the Western District of Washington.  I received training on the
26  proper investigative techniques for these violations.  I have actively participated in
27  investigations of criminal activity, including but not limited to: crimes against persons,
28  crimes against property, fire and explosive related crimes, and crimes involving the

COMPLAINT FOR VIOLATIONS - 3

1   possession, use, theft, or transfer of firearms.  During these investigations, I have also

2   participated in the execution of search warrants and the seizure of evidence indicating the

3   presence of criminal violations.  As a law enforcement officer, I have testified under oath,

4   affirmed to applications of search and arrest warrants, and obtained electronic monitoring

5   orders.

6          The facts set forth in this Affidavit are based on my own personal knowledge;

7   information obtained from other individuals during my participation in this investigation,

8   including other law enforcement officers; review of documents and records related to this

9   investigation; communications with others who have personal knowledge of the events

10  and circumstances described herein; and information gained through my training and

11  experience.  Because this Affidavit is submitted for the limited purpose of establishing

12  probable cause in support of a criminal complaint, it does not set forth each and every

13  fact that I, or others, have learned during the course of this investigation.

14                        **<u>SUMMARY OF PROBABLE CAUSE</u>**

15  **A. The Seattle Police Department.**

16         The Seattle Police Department is involved in interstate and foreign commerce and

17  in activities affecting interstate and foreign commerce.[1]  The Seattle Police Department

18  also is an institution and organization that receives Federal financial assistance.  I have

19  received information from SPD's Chief Administration Officer, who oversees the SPD

20  Grants and Contracts Unit, regarding the numerous federally funded grants SPD is

21

22

23  [1] *See United States v. Odom*, 252 F.3d 1289, 1294 (11th Cir. 2001) ("The legislative history of § 844(i) reveals that the statute was crafted specifically to include some non-business property such as police stations and churches.") (citing *Russell v. United States*, 471 U.S. 858, 860 (1985)); *United States v. Laton*, 352 F.3d 286, 300 (6th Cir. 2003) ("When it crafted § 844(i) to encompass the arson of police stations, Congress recognized that the provision of emergency services by municipalities can affect interstate commerce in the active sense of the phrase.") (citing *Jones v. United States*, 529 U.S. 848, 853 n.5 (2000); *Russell*, 471 U.S. at 860–61); *Belflower v. United States*, 129 F.3d 1459, 1462 (11th Cir.1997) (holding that § 844(i) covered the bombing of a police vehicle which a local sheriff's deputy used in his law enforcement responsibilities and that destruction of a police car had "a significant impact on interstate commerce" because the deputy patrolled traffic and made arrests on an interstate highway, issued citations to out-of-state drivers, participated in interstate narcotic investigations, assisted out-of-state authorities in apprehending suspects, recovered stolen property from other states, and attended law enforcement training sessions in other states).

COMPLAINT FOR VIOLATIONS - 4

currently receiving.  In summary, SPD is presently receiving funding from a variety of federal agencies, including the Department of Justice, the Department of Homeland Security, and the Federal Emergency Management Agency (FEMA).  Collectively, these grants total millions of dollars of federal funding provided to SPD in support of a variety of SPD's core duties and missions, including, but not limited to:

- Enhancing the safety of the community in the event of terrorist threats, active shooter threats, natural disasters, and the gathering of information helpful to law enforcement and the community regarding these sorts of serious threats;

- Providing crime prevention strategies and essential services to elderly, non-English speaking residents, refugees, deaf, blind and developmentally disabled residents of Seattle and working with communities to decrease crime by developing, implementing and coordinating crime prevention programs;

- Bolstering security measures related to the protection of the Port of Seattle;

- Funding the investigations of offenses involving acts of terrorism, chemical, radiological, or biological attacks, crimes against children, and human trafficking; and

- COVID Emergency Stimulus Funding used to pay for things such as personal protective equipment for officers; funding to backfill for officers testing positive for COVID or in quarantine; and the cost of providing protection for lives and property in the event of protests against statewide shelter-in-place orders or re-opening guidelines.

**B. The Arsons of Seattle Police Department Vehicles on May 30, 2020.**

On May 30, 2020, there was a large protest in the downtown area of Seattle, Washington.  SPD officers and other employees were in the area to direct traffic and ensure the safety of people and property.  SPD officers and employees used several vehicles to respond to the protest, including the following vehicles:

COMPLAINT FOR VIOLATIONS - 5

*Vehicle 1:* A 2018 Ford Transit Connect van owned by SPD and assigned to the Video Unit.  This van was not marked as a police vehicle, but was equipped with a police radio and flashing strobe lights.  The SPD Video Unit employees used the van for transportation, to record videos of particular locations and events, and to download surveillance video provided by local businesses and residences in support of SPD criminal investigations.  During the protest on May 30, 2020, SPD used and intended to use the van for transport and to document acts of violence and property destruction.  Vehicle 1 was parked on 6th Avenue between Pine Street and Olive Way.

*Vehicle 2:* A 2006 Dodge Caravan owned by SPD and assigned to the Video Unit.  This van was not marked as a police vehicle, but was equipped with a police radio.  The SPD used and intended to use Vehicle 2 in the same manner as Vehicle 1, both generally and during the protest on May 30, 2020.  Vehicle 2 was parked on 6th Avenue between Pine Street and Olive Way, slightly behind Vehicle 1.

*Vehicle 3:* A 2009 Chevrolet Express Van owned by SPD and assigned to the South Precinct Anti-Crime Team.  This van was not marked as a police vehicle, but was equipped with emergency lights and a police radio.  The SPD used Vehicle 3 for the general purpose of transporting police officers and law enforcement equipment.  During the protest, Vehicle 3 was parked on 6th Avenue between Pine Street and Olive Way, immediately behind Vehicle 2.

*Vehicle 4:* A 2016 Ford Explorer owned by SPD and used as a patrol car.  Vehicle 4 was not marked, but was equipped with a push bumper, emergency lights, police radio, and other police equipment.  During the protest, Vehicle 4 was parked on 6th Avenue between Pine Street and Olive Way, immediately behind Vehicle 3.

*Vehicle 5:* A 2017 Ford Explorer owned by SPD and used as a patrol car.  Vehicle 5 was not marked, but was equipped with a push bumper, emergency lights, police radio, and other police equipment.  During the protest, Vehicle 5 was parked on Pine Street near 5th Avenue.

*Vehicle 6:* A 2016 Ford Explorer owned by SPD and used as a patrol car.  Vehicle 6 was not marked, but was equipped with a push bumper, emergency lights, a police radio, and other police equipment.  During the protest, Vehicle 6 was parked on 6th Avenue between Pine Street and Olive Way, directly behind Vehicle 4.

COMPLAINT FOR VIOLATIONS - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

During the protests on May 30, 2020, Vehicles 1, 2, 3, 4, and 5 were all damaged and destroyed by fire by multiple known and unknown suspects. Vehicle 6 was struck by an ignited incendiary device that then broke open on the adjacent sidewalk. After the arsons, investigators from SPD, FBI, and ATF examined the damaged vehicles. Vehicles 1, 3, 4, and 5 were completely destroyed by fire. Most of what remained were the metal frames of the vehicles. Vehicle 2 was also heavily damaged and is no longer operable, with the interior destroyed and the engine compartment burned. ATF Special Agent and Certified Fire Investigator Dawn Dodsworth examined these vehicles. She classified the fires in Vehicles 1, 3, 4, and 5 as "incendiary," meaning they were caused by human action. She further determined that the fire in Vehicle 2 was caused by the natural extension and expansion of the fire in Vehicle 1 into Vehicle 2.

**C. Tyre Means' Criminal Activities on May 30, 2020.**

On May 30, 2020, three SPD officers were utilizing Vehicle 4. All three officers were issued rifles and had been asked to bring them with them when they deployed to the area of the protest. Two of the officers stored their rifles in locked rifle drawers in Vehicle 4, but there was not room for Officer Kindal Holt's rifle, so she placed her rifle (an FN Herstal FN15 5.56x45mm rifle with serial number FNCR012595) in its rifle bag in the trunk/cargo area of the vehicle. The last time Vehicle 4 was moved, one of the officers parked it on 6th Avenue between Olive Way and Pine Street.

Vehicle 5 was also utilized for the SPD response to the protest. It was parked by SPD officers near the intersection of 5th Avenue and Pine Street.

As noted above, Vehicle 4, Vehicle 5 and other SPD vehicles were set on fire and destroyed between 4:00 p.m. and 5:00 p.m. Prior to the vehicles' destruction, items including firearms and other police equipment were stolen from them.

SPD detectives, ATF special agents (SAs), and FBI SAs have investigated the vehicle arsons and the firearm thefts. During the course of this investigation, the investigators (including myself) located and reviewed numerous photographs and videos of the thefts and destruction of the vehicles. The sources of these photos and videos

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  included: photos taken by police personnel at the scene, footage from building

2  surveillance cameras, footage from local news media outlets, publically reviewable social

3  media posts, and from individuals who attended the protest and took their own

4  photographs and videos.

5      When reviewing photos and videos, investigators noted an individual wearing

6  distinctive red clothing (hereafter referred to as SUSPECT 10) who was seen in

7  numerous videos.  SUSPECT 10 appeared to be a black male and wore the following:

9      Red hooded sweatshirt with large Adidas flower logo on the front and white

10      stripes near the middle of each arm.

12      Red ball cap with large Adidas flower logo.  The bill of the cap had a blue

13      sticker or patch on the right side.

15      Red sweatpants with white designs on the back of the lower leg.  The pants

16      were worn low in the rear such that much of the suspect's gray boxer shorts

17      were visible.  These boxer shorts had small red emblems evenly spaced

18      throughout.

20      Red Adidas shoes with white stripes and white soles.

22      Light blue surgical style mask.

24      Large gold colored rings (worn on the second and third fingers of the right

25      hand).

COMPLAINT FOR VIOLATIONS - 8

Dark bracelet with light colored lettering (worn on left wrist).

  

Still shots of SUSPECT 10 from videos

I saw that SUSPECT 10 had an "S" shaped mark (consistent with a tattoo) under the corner of his left eye.

I reviewed various videos of Vehicle 5 and saw that it was heavily damaged by individuals throwing objects at it, hitting it with objects, climbing on and into it, and jumping up and down on top of it. Ultimately, after several different individuals introduced fire into Vehicle 5 in several different ways, the vehicle was burned and destroyed.

I reviewed a video taken by a citizen that was of high quality and was shot very close to Vehicle 5. At the beginning of this video, Vehicle 5 was already heavily damaged. Subjects were attempting to remove the doors, the windows were smashed, subjects were hitting it with bats and other items, subjects were jumping up and down on the vehicle, and someone had thrown a plant of some sort into the back seat. At the beginning of this video, I did not see any smoke or flames coming from Vehicle 5.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

SUSPECT 10 could be seen holding a paper towel and lighting it with a lighter. Once it was on fire, he placed it into the back seat of Vehicle 5 on top of the plant. Smoke could be seen coming from the vehicle, and small flames were visible inside. Other persons placed additional items onto the flames in Vehicle 5, presumably to add fuel to the fire.

  

Screenshots of Suspect 10 from citizen video

Additional videos and photos showed that after SUSPECT 10 started the fire in Vehicle 5, other individuals sprayed lighter fluid into the vehicle, threw fireworks into the vehicle, threw a burning cloth into the vehicle, threw an incendiary device into the vehicle, and burned the vehicle using an aerosol can and lighter. Vehicle 5 was later examined by an ATF Certified Fire Investigator (CFI), who classified the fire as incendiary, meaning it was caused by human action.

Other SAs and I reviewed surveillance video from the nearby Nordstrom building. This surveillance camera footage was of lower quality and from a vantage point further away from Vehicle 5 than the above-referenced citizen footage, but it captured the destruction of Vehicle 5. The surveillance footage showed that at approximately 4:03 p.m., SUSPECT 10 reached into the back seat of Vehicle 5, corresponding with him placing the lit paper towel into the vehicle. After he did so, the crowd around the vehicle

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  suddenly started backing away.  (At the end of the citizen's video, the crowd backed

2  away from the vehicle, and I could hear numerous people yelling "back up!")

3  Other SAs and I also reviewed surveillance video from the Nordstrom building

4  that showed Vehicle 4.  The video showed that multiple subjects vandalized the vehicle

5  and destroyed some of the vehicle's windows.  I saw that SUSPECT 10 approached the

6  rear of Vehicle 4.  He looked inside through the destroyed rear window.  At

7  approximately 4:14:58 p.m., SUSPECT 10 reached inside Vehicle 4 and pulled out a rifle

8  bag.  He placed it on the sidewalk.  At approximately 4:15:04 p.m., he appeared to open it

9  up and look inside the bag.  As soon as he looked inside, SUSPECT 10 quickly picked

10 the bag back up and began running away from Vehicle 4 on 6th Avenue towards Pine

11 Street.  He was chased by an unknown white male in dark clothing.  This unknown male

12 attempted to grab either the rifle bag or SUSPECT 10.  SUSPECT 10 managed to retain

13 the bag and the interaction caused the unknown subject to fall to the ground.  SUSPECT

14 10 continued running with the bag on 6th Avenue towards Pine Street.

15 Other SAs and I located additional surveillance video that showed SUSPECT 10,

16 moments later, standing with the rifle bag on Pine Street between 5th Avenue and 6th

17 Avenue.  He was approached by a black male with a backpack and frizzy hair.  A

18 physical confrontation ensued, and at approximately 4:15:30 p.m., SUSPECT 10 dropped

19 the rifle bag on the ground.  SUSPECT 10 punched the unknown male several times.

20 While this was happening, the rifle bag was quickly picked up by a subject in a blue

21 jacket who was not involved in the fight.

22 Numerous other people swarmed around the fight and separated SUSPECT 10 and

23 the unknown black male.  The unknown black male approached the unknown male in the

24 blue jacket and took the rifle bag.  The unknown black male then gave the rifle bag back

25 to the subject in the blue jacket, who walked away on Pine Street towards 5th Avenue.

26 //

27 //

28 //

COMPLAINT FOR VIOLATIONS - 11

1   SUSPECT 10, whose clothes were in disarray after the fight, put his sweatshirt
2  back on and ran in the direction in which the unknown male in the blue jacket had left
3  with the rifle bag.
4      Later in the day on May 30, 2020, the rifle bag containing the rifle issued to
5  Officer Holt was returned to the Seattle Police West Precinct by an anonymous subject.



Photo of Rifle after it was recovered

18      After considering the manufacturer and model of Officer Holt's rifle and
19  examining photographs of it, an ATF special agent who has additional training related to
20  determining the origins of firearms and is considered an interstate nexus expert
21  determined the rifle was not manufactured in Washington.
22      Officer Holt was later shown surveillance footage of SUSPECT 10 removing the
23  rifle bag from Vehicle 4.  Based on its appearance and the location from which
24  SUSPECT 10 took the bag, Officer Holt could tell the bag taken by SUSPECT 10 was
25  the one that contained her issued rifle.  I met with Officer Holt and examined her rifle
26  bag.  I saw that if the bag was opened in the same manner that SUSPECT 10 appeared to
27  open it after removing it from Vehicle 4, the rifle inside was clearly visible.
28

COMPLAINT FOR VIOLATIONS - 12

**C. Identification of Means as SUSPECT 10.**

When reviewing video footage and photographs from various sources, other SAs and I noticed that SUSPECT 10 was in close proximity to a particular female during much of the footage and in many of the photographs.  The interactions between the two included: SUSPECT 10 walking with the female, SUSPECT 10 handing the female an item he took out of one of the patrol cars, SUSPECT 10 putting his hand on the female's back in a gesture that seemed to indicate familiarity, and the female running to SUSPECT 10's aid and joining the fight between SUSPECT 10 and the unknown black male.  For these reasons, it was apparent that the female and SUSPECT 10 knew each other.  There were several images of the female associate without a mask.  In at least one of these photos, a tattoo was visible on the female associate's chest.

SAs located open source social media photographs that appeared to match the female associate.  The female depicted in the social media photographs (which included a modeling website, a Facebook profile, and multiple Instagram accounts) had a tattoo on her upper chest that read, "Mrs Arnold Alexander."  The "Mrs" was located in the center of the chest, just below the neck and above the "Arnold Alexander."  SAs noted that in one of the photos of the female associate from May 30, 2020, a tattoo of a short word consistent with "Mrs" was visible in the center of the female associate's chest, just below her neck.  SAs also noted what appeared to be the top of an additional tattoo below the "Mrs."

The name listed on the modeling profile was "Heather Darleen (HD) Arnold-Alexander."  SAs located a Washington Department of Licensing (DOL) driver's license listing for Heather Arnold-Alexander.  The DOL photograph appeared to match the female associate and the female on social media.  I also noted that in the DOL photograph, the top of a tattoo was visible in the center of Arnold-Alexander's chest below her neck.

//

//

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

I further noted that the social media subject had a Facebook page under the name "HD Apache."  I noted that "Heather Apache" was listed as a previous name in Arnold-Alexander's DOL information.

Via a search of the National Crime Information Center (NCIC), I learned that Arnold-Alexander was the protected party in a domestic violence protection order which prohibited Tyre Wayne MEANS from contacting her or communicating with her.  The protection order had been served on April 24, 2018.

In a search of MEANS' NCIC criminal history, I saw MEANS had two arrests related to violating the protective order.  One of these offenses was as recent as October 17, 2019.

I reviewed King County jail booking photographs from MEANS's most recent arrest on January 31, 2020.  I compared MEANS general appearance to that of SUSPECT 10.  He appeared to match.  I also saw that MEANS's booking photo showed he had an "S" shape tattoo below his left eye in the same location as SUSPECT 10.  The tattoos appeared to match.

 

KCJ Booking Photo of MEANS          SUSPECT 10 (Photo slightly brightened)

COMPLAINT FOR VIOLATIONS - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   As noted above, in various photos and videos investigators saw SUSPECT 10

2   wearing two large gold rings on the second and third fingers of his right hand.

 

Still frames of SUSPECT 10's rings

15   I learned that MEANS had been arrested by Seattle Police on January 31, 2020.  I

16   reviewed body-worn video from SPD officers involved in the arrest.  MEANS was not

17   wearing rings at the time of his arrest.  However, I reviewed video from when officers

18   were examining the items removed from MEANS' person and clothing and discussing

19   which items should be booked as evidence and which should go with MEANS to the

20   King County Jail.  They mentioned that MEANS's property included rings.

21   At one point in the video when looking into a paper bag containing items removed

22   from MEANS' person and clothing, the officers discussed that MEANS had "two gold

23   rings."  The rings could be heard making a clinking sound in a paper bag, but were not

24   visible on the video.

25   I contacted the King County Jail to obtain records of property brought to the jail

26   with MEANS on January 31, 2020.  I reviewed MEANS' Inmate Property Inventory

27   form.  I saw that MEANS' property included two rings.  I also saw that MEANS had

28   signed the form acknowledging he had received all his property back at the time of his

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

release.  (From a review of King County Jail records, I saw this release took place on May 4, 2020.)

I determined that MEANS was subject to Washington Department of Corrections (DOC) community custody supervision as a result of a 2018 Kitsap County Superior Court felony conviction for Assault 3rd Degree—Domestic Violence.

I met with the Community Corrections Officer (CCO) who was responsible for monitoring MEANS.  I learned that MEANS described himself as homeless with no specific address and living in Bremerton, Washington.  As such, MEANS was supervised out of the Bremerton Washington DOC office.

The CCO who supervised MEANS explained that MEANS typically checked-in via phone.  He further explained that MEANS reported that he had no phone of his own, so he borrowed a friend's phone to call in about once per week.  The CCO explained that the last time MEANS had reported in person had been slightly less than a month earlier. He did not recall MEANS wearing any distinctive clothing or jewelry.

I showed the CCO a cropped photograph of the red track suit Suspect 10 was wearing on May 30, 2020.  The CCO did not recognize the clothing.  I showed the CCO a cropped photograph of SUSPECT 10's face, including his tattoo.  The CCO said he recognized SUSPECT 10 as MEANS.

The CCO told me that on August 19, 2020, he spoke with MEANS over the phone.  The CCO had asked about MEANS' employment, and MEANS told him he was working on music videos.  By giving the CCO search terms, MEANS directed him to a YouTube video that he said included both him and his brother.  The CCO showed the video to me.  I saw that MEANS was in the video and appeared to be wearing one or both of the rings worn by SUSPECT 10 on May 30, 2020.

After concluding the interview with the CCO, I reviewed the YouTube video in greater detail and downloaded a copy of it.

COMPLAINT FOR VIOLATIONS - 16

I saw the video was titled: *"Hopped Off the Porch" Get Money x Pharaoh [Dir:@KameVisionz].* YouTube indicated it had premiered on August 14, 2020.  The video was located at https://www.youtube.com/watch?v=2MudG8qdLsI

When I reviewed the video, I saw it depicted several individuals singing, dancing, handling money, and handling firearms.  Based on landmarks (including the Space Needle and Pioneer Square signs), the video appeared to have been shot in downtown Seattle.  I recognized one of the individuals in the video as MEANS.  I could tell it was MEANS by recognizing his face, by the "S" shaped tattoo near his left eye, and by the forearm tattoos that matched MEANS' booking photos.

I saw MEANS was wearing two rings.  One was large and the other smaller. There were numerous instances in which MEANS displayed his hands and the rings to the camera.  I compared the larger ring MEANS was wearing in the YouTube video to the unusually shaped ring SUSPECT 10 was wearing in the videos taken on May 30, 2020.  I saw that it appeared to match.

COMPLAINT FOR VIOLATIONS - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9

 

10
11
12
13
14
15
16

 

From SUSPECT 10 on 5/30/2020      From MEANS in YouTube video

17
18
19
20
21
22

    I noted that the smaller ring MEANS wore in the YouTube video was a dollar sign.  I compared the YouTube video to the video of SUSPECT 10 on May 30, 2020.  Although the May 30, 2020 footage was not as clear as the YouTube footage, I saw that the smaller ring worn by SUSPECT 10 appeared generally consistent with the dollar sign ring worn by MEANS in the YouTube video.

23
24
25
26
27
28

COMPLAINT FOR VIOLATIONS - 18








From SUSPECT 10 on 5/30/2020          From MEANS in YouTube video

The YouTube.com page for the video which featured Tyre MEANS also contained a portion of text entered from the account that posted the video. It read, "Follow Social Medias Below." The first two social media accounts listed were @Pharoah1099 and @Squarebabygetmoney.

Based on my review, the Instagram account Pharoah1099 appeared to be used by a male associate of MEANS. I saw a photo that was posted on March 9, 2020. The photo

was of three males, one of whom was (based on appearance and face tattoo) MEANS.

MEANS was wearing a red track suit, red shoes, and a red cap.  He was making a gesture

to the camera, and rings were visible on two of the fingers of his left hand.

I compared the red track suit in the Instagram photo to the one worn by SUSPECT

10 on May 30, 2020.  I saw the general appearance, pattern, and locations of logos

appeared to match.

 

SUSPECT 10                          From Instagram Post

The rings worn by SUSPECT 10 and by MEANS in the Instagram photograph

also appeared consistent. (Although they were worn on the right hand on May 30, 2020,

and on the left hand in the Instagram photo.)

In the Instagram post, MEANS was wearing red Adidas shoes with white stripes

and white soles.  These appeared to match the shoes worn by SUSPECT 10 on May 30th.

COMPLAINT FOR VIOLATIONS - 20

 

SUSPECT 10                    Instagram Post

In addition, in the Instagram post, MEANS was wearing a red ball cap.  However, since it was worn backwards, I was not able to compare it to the red cap worn by SUSPECT 10 on May 30th.

Based on my review, the Instagram account Squarebabygetmoney appeared to be used by MEANS.  I came to this conclusion based on the numerous photos of MEANS, the moniker "Get Money" used on the page (which, based on booking photos, is tattooed on MEANS's arms), and a post indicating the user of the page was in a relationship with Arnold-Alexander.

MEANS' account contained photos of MEANS wearing rings, one of which appeared consistent with the larger ring worn by SUSPECT 10.  I also saw a photo posted to this account that showed MEANS wearing what appeared to be red Adidas shoes that matched the ones worn by SUSPECT 10.  In this photo, MEANS was also wearing a red cap, but the front of it was not visible.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



1
2
3
4
5
6
7
8
9
10
11

12        MEANS' account also contained a post that was a photo of Arnold-Alexander.

13  The caption read, *"Married 5 years to my beautiful wife @savage.lil.bissh she crazy*

14  *crazy about me but I'm even crazier about her."*

15        The Instagram account @savage.lil.bissh contained numerous photos and videos

16  of MEANS and Arnold-Alexander together.

17        During a surveillance operation during October 2020, investigators observed

18  MEANS and Arnold-Alexander together in Seattle, Washington.  Arnold-Alexander was

19  wearing red pants that appeared to match the ones SUSPECT 10 wore on May 30, 2020.

20  I compared photos taken during the surveillance to photos of SUSPECT 10 on May 30,

21  2020.  When comparing the red pants in each photo, I saw they had the same distinctive

22  pattern on the lower legs and the same emblem on the right rear buttocks.  I noted that the

23  pants appeared ill fitting on Arnold-Alexander and that the legs were rolled up, possibly

24  to make them shorter.  Based on this, I suspected they may have been the same pair of

25  pants, borrowed from MEANS by Arnold-Alexander.

26
27
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE5220
SEATTLE, WASHINGTON 98101
(206) 553-7970





SUSPECT 10                    Arnold-Alexander during Surveillance

### D.    Means is Prohibited from Possessing Firearms under Federal Law.

I reviewed MEANS' NCIC criminal history and confirmed that he had two 2015 felony convictions in Baker County, Georgia. One conviction was for *Serious Injury by Vehicle* and the other was for *Willful Obstruction of Law Enforcement Officers by Use of Threats or Violence*. MEANS was sentenced to two years of imprisonment and 15 years of probation. I also saw MEANS had a 2018 Kitsap County Superior Court felony conviction for *Assault 3rd Degree—Domestic Violence*. For this offense, MEANS was sentenced to three months of imprisonment.

I have obtained and reviewed court records related to the Domestic Violence No Contact Order issued on April 24, 2018, in the matter of *State of Washington v. Tyre Wayne Means Jr.*, in Kitsap County Superior Court case number 17-1-01804-18. The Court in that matter issued an Order against MEANS that meets all of the requirements

COMPLAINT FOR VIOLATIONS - 23

1   set forth in 18 U.S.C. § 922(g)(8)(A)-(C), and therefore prohibits MEANS from
2   possessing a firearm under federal law.  Specifically, the court documents establish that,
3   as required by § 922(g)(8), MEANS received notice of the hearing and was actually
4   present at the hearing and personally signed the Order; the Order restrains MEANS from
5   harassing, threatening, and stalking Heather Arnold-Alexander, who was found by the
6   court to be a "current or former cohabitant as intimate partner"; and the Order prohibits
7   the use and threatened use of physical harm and bodily injury against Arnold-Alexander.
8   The Order was entered on April 24, 2018, and was to remain in effect for five years.

9   **<u>CONCLUSION</u>**

10        Based on the foregoing, I respectfully submit that there is probable cause to
11   believe that TYRE WAYNE MEANS committed the above-referenced offenses.

Digitally signed by
GREGORY HELLER
Date: 2020.10.08 12:41:26
-07'00'

GREGORY HELLER
Special Agent, ATF

16        The above agent provided a sworn statement attesting to the truth of the contents
17   of the foregoing affidavit on the ___13___ day of October, 2020.  Based on the Complaint
18   and the sworn statement, the Court hereby finds that there is probable cause to believe the
19   Defendant committed the offenses set forth in the Complaint.

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

COMPLAINT FOR VIOLATIONS - 24